# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANN LAZZARO, | ) | |
| | ) | |
| Plaintiff, | ) | 09cv1140 |
| | ) | ELECTRONICALLY FILED |
| v. | ) | |
| | ) | |
| RITE AID CORPORATION | ) | |
| RITE AID OF PA, INC. | ) | |
| AND THRIFT DRUG, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the Court is defendants' Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 (Doc. No. 28). Plaintiff, Joann Lazzaro, sued defendants under Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) *et seq.,* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951 *et seq.,* alleging that the defendants intentionally discriminated against her based on her age and gender by terminating her from her position as Rite Aid Store Manager at the Wilkinsburg location on June 3, 2008. (Doc. No. 5 at ¶ 11). In her Amended Complaint, plaintiff contended that defendants' reasons for terminating her are pretextual, or otherwise indicative of a discriminatory animus.

Conversely, defendants claim that plaintiff was terminated because she allowed persons who were not Rite Aid employees to work at a Rite Aid store; thereby terminating her for cause (*i.e.*, violating a company policy) and not merely pretext. Defendants also assert that they are entitled to judgment as a matter of law with respect to plaintiff's claim for punitive damages. Finally, defendants contend that Rite Aid Corporation and Rite Aid of PA, Inc., cannot be held

liable because they were not plaintiff's employer. Plaintiff disagrees with all three contentions, and urges the Court to find that there is a genuine issue of material fact.

For reasons set forth in greater detail below, this Court will deny defendants' Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

The following facts are not contested unless otherwise indicated.

Defendants or their predecessors employed plaintiff for thirty-six (36) consecutive years, beginning on June 20, 1972. Doc. No. 5 at ¶ 4. In June of 2007, she began working as a store manager with Rite Aid after Rite Aid acquired Brooks/Eckerd stores. *Id.* at ¶ 11. After her former Brooks/Eckerd store closed in October of 2007, plaintiff was transferred as Store Manager to Store #10935 ("Wilkinsburg Store") located in Wilkinsburg, Pennsylvania. Doc. No. 37 at ¶ 23.

In February of 2008, Jeff Suriano became plaintiff's supervisor when he became the District Manager responsible for the Wilkinsburg Store. *Id.* at ¶ 25. During Mr. Suriano's first visit to the Wilkinsburg Store in February of 2008, he commented that he thought she was retiring, noting that she had worked there for 30 years. *Id.* at ¶ 26. Plaintiff corrected him noting it would be 36 years in June. *Id.* Mr. Suriano commented "that's almost as long as I have been born." *Id.* Mr. Suriano further mentioned that he "swore he heard that she was retiring" on at least two other occasions subsequent to that encounter. *Id.* at ¶ 28; *see also*, Defendant's Brief in Support of Motion for Summary Judgment, Doc. No. 31 at p. 8. Additionally, Mr. Suriano used the "F-word" in plaintiff's presence in a non-sexual way and in the presence of others, both men and women. *Id*. at ¶¶ 29-30.

On March 24, 2008, five plaintiff's family members, none of whom were employees of

2

defendants, assisted plaintiff by helping to prepare the store for its upcoming inventory. *Id.* at ¶¶ 35, 38. Plaintiff claims she admitted these facts to Mr. Suriano, who said he would "look the other way this time." *Id.* at ¶¶ 38-9. Although defendants accept plaintiff's recount of the events of March 24, 2008 as true for summary judgment purposes only, Mr. Suriano denies that he had any conversations with plaintiff on March 24, 2008 regarding her family working in the Wilkinsburg Store. *Id.* at ¶ 36, n. 2. It is not disputed that plaintiff's family members did not undergo Rite Aid's applicant/employee hiring and screening process or otherwise recorded their time working at the Wilkinsburg Store. *Id.* at ¶ 32.

On March 25, 2008, Mr. Suriano gave plaintiff a "Written Notice Form" as a result of the Wilkinsburg Store's poor performance on its inventory. *Id.* at ¶ 41. On May 5, 2008, plaintiff met with Mr. Suriano and Lynne Shawley, Rite Aid's Human Resources Manager, regarding her poor inventory performance and attendance. *Id.* at ¶ 46. During this meeting, Mr. Suriano raised the concern that plaintiff's family members worked at the Wilkinsburg Store on March 24, 2008 to prepare for inventory. *Id.* at ¶ 47. Plaintiff admitted to having her family members perform work at the Wilkinsburg Store, but claimed that Mr. Suriano knew of this fact, and had been on the phone with plaintiff while her family members were working at the store. *Id.* at ¶¶ 48, 49. Mr. Suriano denied having any knowledge of plaintiff's family members performing work on March 24, 2008 but admitted he learned of it later. *Id.* at ¶ 50. Ms. Shawley also relayed to plaintiff that "your people say your [sic] always complaining about aches and pains" and "your people said that you were very slow to catch on to the new Rite Aid system." *Id.* at ¶ 51. Ms. Shawley did not discipline plaintiff or Mr. Suriano at the May 5, 2008 meeting, but instead, informed plaintiff that she would conduct an investigation regarding the extent to which plaintiff's family members were

performing work at the Wilkinsburg Store.[1]  *Id.* at ¶ 55.

After presenting plaintiff with the allegations of her apparent misconduct, Ms. Shawley requested that plaintiff write down who worked at the store and for how long.  *Id.* at ¶¶ 61, 63.  Plaintiff then provided a written statement wherein she approximated the amount of time her family members worked at the Wilkinsburg Store on March 24, 2008.  *Id.* at ¶ 64.  Ms. Shawley then suspended plaintiff for her alleged misconduct.  *Id.* at ¶ 65.  Ms. Shawley did not discipline Mr. Suriano for his alleged knowledge of plaintiff's family members working in the Wilkinsburg Store.  *Id*. at ¶ 140.

On June 2, 2008, Ms. Shawley submitted a request for plaintiff's termination to Dennis Palko, Senior Human Resources Manager.  *Id.* at ¶ 67.  Mr. Palko forwarded the termination recommendation to Michelle Stahl, the Senior Divisional Human Resources Director, requesting her approval for plaintiff's termination.[2]  *Id.* at ¶ 68.  Ms. Stahl consulted with Matthew Miles, Divisional Vice President, who approved plaintiff's termination for her alleged misconduct.  *Id.* at ¶ 71.  At the instruction of Ms. Shawley, Mr. Suriano then called Plaintiff on June 3, 2008 to inform her that she had been terminated.  *Id.* at ¶ 72.

Rite Aid transferred 25-year-old Dan Czerpak to the Wilkinsburg Store to fill the store manager position vacancy.  (*Id.* at ¶ 74).  Subsequent to plaintiff's termination, defendant has terminated at least four other persons, George Delmont (45), Sean Sanders (37), Vera Matey (55) and Sandy Vesco (47) who were employed as store managers, for permitting individuals who were not employed by Rite Aid to perform work at their respective stores.  *Id.* at ¶¶78-100.  Mr.

---

[1] Ms. Shawley received written witness statements from shift supervisors Tanya Searcy and Theresa Clotworthy at the Wilkinsburg Store.  (Doc. No. 29 at ¶ 59).  Plaintiff disputes the partiality of Ms. Searcy and Ms. Clotworthy, stating that she experienced "great resistance" from them.  (Doc. No. 37 at ¶ 43.)

[2] Although Ms. Shawley and Mr. Suriano recommended plaintiff's employment be terminated, neither had the authority to do so.  (Doc. No. 29 at ¶ 70.)

Delmont was replaced by Steven Thomasulo (27), Mr. Sanders was replaced by Monica Bender (24), Ms. Matey was replaced by Alexander Munn (34), and Ms. Vesco was replaced by Maira Herre (57). *Id.* at ¶¶ 85, 90, 95, 100. All terminations occurred after plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 21, 2008. *Id*. at ¶ 170.

Defendant maintains an employee handbook known as its "Associate Atlas." *Id*. at ¶ 5. The Associate Atlas contains defendant's Equal Employment Opportunity Policy, Nondiscrimination Policy, Harassment in the Workplace Policy, and Anti-Retaliation Policy, as well as an Open Door Communication Policy and an Associate Complaint Resolution Procedure. *Id.* at ¶¶ 6-7. Defendants regularly train managers and supervisors on these policies. *Id.* at ¶ 9. Defendant's Nondiscrimination Policy was posted in the Wilkinsburg Store. *Id.* at ¶ 8.

Plaintiff's date of birth is July 20, 1952 and she was 55 years old on the date of her termination. *Id.* at ¶ 10. During her 36 years of employment, defendants or their predecessors never disciplined plaintiff, or warned of any deficiencies in her performance. Doc. No. 5 at ¶ 8.

## II. STANDARD OF REVIEW

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242. 249-50 (1986). When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. *Id.*

To demonstrate entitlement to summary judgment, defendant, as the moving party, is not required to refute the essential elements of the plaintiff's cause of action. Defendant need only point out the absence or insufficiency of plaintiff's evidence offered in support of those essential elements. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). Once that burden has been met, plaintiff must identify affirmative evidence of record that supports each essential element of the cause of action. *Id.* If plaintiff fails to provide such evidence, she is not entitled to a trial, and defendants are entitled to summary judgment as a matter of law. *Id.*

While summary judgment is typically disfavored in employment discrimination cases, it is appropriate when a plaintiff relies on mere inferences, conjecture, speculation or suspicions. *See Anderson v. School District of Philadelphia,* 1998 U.S. Dist. LEXIS 4232, 1998 WL 151034, \*5 (E.D. Pa. 1998). Similarly, summary judgment may not be granted if there is a disagreement over what inferences can be reasonably drawn from the facts, even if the facts are undisputed. *Ideal Dairy Farms, Inc. v. John Labatt. Ltd.,* 90 F.3d 737, 744 (3d Cir. 1996), *citing Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1381 (3d Cir. 1991). Moreover, "any unexplained gaps in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Ideal Dairy Farms,* 90 F.3d at 744, *quoting Ingersoll-Rand Financial Corp. v. Anderson,* 921 F.2d 497. 502 (3d Cir. 1990)(quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Finally, we do not distinguish between the claims under federal and Pennsylvania law in our disposition of this case as the standards are the same for purposes of determining the summary judgment motion. *See Kelly* v. *Drexel Univ.,* 94 F.3d 102, 105 (3d Cir.1996).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents

6

a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is so one-sided that the movant must prevail as a matter of law. It is on this standard that the court has reviewed defendants' motion and plaintiff's response thereto.

### III. DISCUSSION

#### A. Title VII, ADEA and PHRA Claims

We begin our analysis of plaintiff's age and sex discrimination claims pursuant to the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).[3] First, the plaintiff must establish a prima facie case of discrimination. *Id.* A successfully demonstrated prima facie case raises an inference or presumption of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-253 (1981). This consists of evidence that, under the circumstances, raises at least a reasonable inference that the action taken by the employer, if otherwise unexplained, was based on impermissible factors such as race or sex. *Id.*

For example, in Title VII claims a plaintiff must show that: (1) she is a member of a class of persons protected by Title VII; (2) she either satisfactorily performed a job, or applied or would have applied and was qualified for a job for which the employer was seeking applicants; (3) she was either disciplined or terminated from her current job despite her satisfactory performance, or rejected for the prospective position despite her qualifications; and (4) either other employees of another Title VII class were disciplined less severely than the plaintiff, or, after her

---

[3] While the United States Court of Appeals for the Third Circuit has consistently held that the *McDonnell Douglas* framework applies in ADEA cases, the Supreme Court has not squarely addressed this question. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 144 (2000). The appropriate framework for ADEA claims is set forth in *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994). *See Torre v. Casio, Inc.,* 42 F.3d 825, 829-30 (3d Cir. 1994) (applying *Fuentes* in an ADEA case). The *McDonnell Douglas* framework has also been applied to PHRA cases. *See Bernard v. Bethenergy Mines, Inc* . 837 F.Supp. 714, 715 (W.D. Pa. 1993), *aff'd.* 31 F.3d 1170 (3d Cir.1994); *Fairfield Township Volunteer Fire Co. v. Commonwealth,* 609 A.2d 804, 805 (Pa. 1992).

7

rejection for a job or termination, the employer sought applications from individuals with qualifications no better than hers. *Furnco Const. Corp. v. Waters,* 438 U.S. 567 (1978).

Similarly, in an ADEA suit alleging unlawful termination, step one of the *McDonnell Douglas* framework requires the plaintiff to present evidence sufficient for a reasonable trier of fact to find each element of a prima facie case. *Fakete v. Aetna Inc.,* 308 F.3d 335, 338 n. 3 (3d Cir. 2002) (citing *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir. 1997)). Thus the plaintiff must show: (1) that she was at least forty years old, (2) that she was fired, (3) that she was qualified for the job from which she was fired, and (4) that she "was replaced by a sufficiently younger person to create an inference of age discrimination." *Id.* An ADEA plaintiff is not required to show that age was the *only* determinative factor in a discharge, but rather that it was *a* determinative factor (i.e., one that made a difference) in the employer's decision to terminate the employee. *Fuentes*, 32 F.3d at 764 (emphasis added); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) (holding that under the ADEA, employee's protected trait must have had a determinative influence on the outcome); *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2350 (2009) (holding that to establish a disparate-treatment claim, plaintiff must prove that age was "but-for" cause of employer's adverse decision).

It is worth noting, however, that a prima facie case is not the equivalent of a finding of discrimination. *Furnco,* 438 U.S. at 579-80. Rather, it is merely proof from which discriminatory animus may be inferred. Experience has shown that in the absence of any other explanation, it is more likely than not that those actions were based on impermissible considerations. *Id.*

If the plaintiff succeeds in establishing a prima facie case, step two of the *McDonnell Douglas* framework shifts the burden to the defendant "to articulate some legitimate,

nondiscriminatory reason for the employee's rejection." *Id.; see St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993) (holding that employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision). This burden is not one of persuasion, but is carried by raising a genuine issue of fact as to whether the defendant did in fact discriminate against the plaintiff by presenting a reason for the action that is "clear and reasonably specific." *Burdine,* 450 U.S. at 258.

Third, should the defendant carry this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a "pretext for discrimination." *See Burdine,* 450 U.S. at 253; *e.g., Jones v. School Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999). In other words, the plaintiff may attempt to establish that she was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256.

Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, *Hicks,* 509 U.S. at 511, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and "inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 144 (2000), citing *Burdine,* 450 U.S., at 255, n. 10. Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253.

The elements of a prima facie case of discrimination are established in plaintiff's case. She is a member of a protected class (both her age and gender), she was capable of performing her

work as a store manager satisfactorily and had not previously received poor performance evaluations, she was subject to an adverse employment decision, and she was ultimately replaced by someone not in a protected group. Moreover, defendants do not dispute that plaintiff is able to establish the elements of a prima facie case of sex or age discrimination.

Defendants assert in their Brief in Support of their Motion for Summary Judgment, however, that plaintiff was involuntarily terminated as a result of her allowing family members, who were not employees of Rite Aid, to work at the Wilkinsburg Store. The burden shifts to plaintiff to establish that defendants' reasons for involuntarily terminating her employment were pretextual or otherwise indicative of a discriminatory animus.

To establish pretext, plaintiff must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764. To defeat a motion for summary judgment, a plaintiff must, therefore, discredit the proffered reasons, either circumstantially or directly, *or* adduce evidence whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Id.* (emphasis added). The factual dispute at issue is whether discriminatory animus motivated the employer. To succeed, plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered legitimate reasons for its actions so that a reasonable fact-finder could rationally find them "unworthy of credence." *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992)).

Returning to the instant matter, we begin our evaluation not with whether plaintiff has

*proven* pretext, but whether at this stage in the proceedings the plaintiff has proffered legitimate reasons so that a reasonable fact-finder *could* decide that defendant's proffered reasons for its employment decision could be characterized as "pretextual."

During Mr. Suriano's first visit to the Wilkinsburg Store he commented to plaintiff that he thought she was retiring and that she had been working there almost as long as he had been alive. On subsequent occasions Mr. Suriano told plaintiff that he swore he heard she was retiring. Plaintiff testified that Mr. Suriano also had occasion to use profane language in her presence. Furthermore, during the May 5, 2008 meeting, Ms. Shawley commented to plaintiff that "her people say [plaintiff] is always complaining of aches and pains" and "was very slow to catch on to the new Rite Aid system."

Although Mr. Suriano denies any knowledge or awareness of plaintiff's family members working at the Wilkinsburg Store on March 24, 2008, viewing all evidence in a light most favorable to plaintiff as the non-moving party, this Court concludes that, at the very least, there is a genuine issue of a material fact regarding whether or not Mr. Suriano knew plaintiff's family members were performing work at the Wilkinsburg Store.  A determination as to whether Mr. Suriano did in fact have knowledge of plaintiff's family members performing work at the store not only permits a fact-finder to draw a reasonable inference as to whether plaintiff's disparate treatment claim has merit, but also enables the fact-finder to consider whether defendants treated Mr. Suriano, a younger male, age 37, differently than plaintiff, an older female, age 55.

In addition, this Court notes that plaintiff was the first store manager to have been fired for having non-employees perform work at a Rite Aid store.  Although defendants terminated four other employees for the same reason, all four were terminated after plaintiff filed her EEOC charge.  The Court further notes that the parties have failed to proffer any evidence of a policy

11

prohibiting non-employees from volunteering their services; and the violation of same being immediate termination. Further, plaintiff offered testimony that she would not have had family members work in the store had she known she was directly violating such a company policy. (Doc. No. 37 at ¶ 163).

Plaintiff points out that the average age of the five terminated employees (including plaintiff) was 47.8 years, while their replacements averaged almost 14 and 1/2 years younger, or 33.4 years. (Doc. No. 35 at p. 14). Although one member of the group of fired managers was under 40, and one of the replacements was older than the manager she replaced, it is a question of fact for a jury to determine whether defendants were using terminations for violations of an unwritten company policy as pretext, thus promoting the inference that a pattern of termination exists whereby older store managers are replaced with younger ones. Simply providing the Court with evidence that defendant has terminated other store managers for the same reason as plaintiff in no way legitimizes a pattern of termination that a reasonable fact-finder may otherwise conclude is pretext.

Based on the above, this Court finds that plaintiff has adduced enough evidence that could lead a reasonable fact-finder to conclude discrimination was more likely than not a motivating or determinative cause of the adverse employment action, and therefore can withstand defendant's Motion for Summary Judgment.

### B. Punitive Damages Claim

Title VII of the Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e *et seq.*) protects employees from discrimination on the basis of sex, race, color, national origin and religion. As originally enacted, however, Title VII provided only equitable relief, primarily backpay. It did not allow for additional remedies, including punitive damages. *See Landgraf v. USI Film Products*, 511 U.S. 244, 252-53 (1994). That limitation, coupled with several U.S. Supreme Court decisions, led to the enactment of the Civil Rights Act of 1991, which made a number of changes to Title VII. Most notably, Congress created a provision allowing compensatory and punitive damages in Title VII claims. *See* 42 U.S.C.A. §1981a(b)(1).

Punitive damages are limited, however, to cases in which the employer has engaged in intentional discrimination and has done so "with malice or with reckless indifference to the federally-protected rights of an aggrieved individual." Rev. Stat. § 1977, as amended, 42 U.S.C.A. §1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). The *Kolstad* Court noted that Congress relied on *Smith v. Wade*, 461 U.S. 30 (1983), choosing the terms, "malice" and "reckless indifference" for §1981a(b)(1). *Id.* In *Smith*, the Court concluded, "a jury may be permitted to assess punitive damages . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or involve reckless or callous indifference to the federally-protected rights of others." 461 U.S. at 56. Therefore, in order to be held liable for punitive damages, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law. *Kolstad*, 527 U.S. at 536.

The *Kolstad* Court also held that "[t]he inquiry does not end with a showing of the requisite

"malice or . . . reckless indifference" on the part of certain individuals, however. 42 U.S.C. § 1981a(b)(1). The plaintiff must impute liability for punitive damages to the defendant." *Id*. at 539. The *Kolstad* Court then went on to recognize that common law has long recognized that agency principles limit vicarious liability for punitive damages and noted that Congress directed the Courts to interpret Title VII based on these agency principles. *Id*. at 541.

Relying on Restatement (Second) of Agency §217 C, the Court held that an employer may be vicariously liable for the discrimination of its employee if the employee was serving in a "managerial capacity" and committed the wrong while "acting in the scope of his employment." *Id.* at 542-543. See also, *Ridley v. Costco Wholesale Corp.*. 217 Fed.Appx. 130 (3d Cir. 2007). The Court noted that "no good definition of what constitutes 'managerial capacity' has been found," and suggesting that courts consider: (1) the type of authority that the employer has given to the employee, (2) the amount of discretion that the employee has in what is done, and (3) how it is accomplished. *Id*. at 543. In addition, the Court found a similar definitional problem with "scope of employment," and held that the Restatement's definition of the term was too broad because it would vicariously punish "even an employer who makes every effort to comply with Title VII" for the discriminatory acts of its agents acting in a managerial capacity. *Id*. at 543-544.

The Court succinctly commented on this dichotomy as follows:

> Holding employers liable for punitive damages when they engage in good faith efforts to comply with Title VII, however, is in some tension with the very principles underlying common law limitations on vicarious liability for punitive damages – that it is "improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously."

*Id.* at 544. In light of this contrast, the *Kolstad* Court then held:

> Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory

14

employment decisions of managerial agents where these decisions are contrary to the employer's "good-faith efforts to comply with Title VII."

*Id.* at 545. After providing all the aforementioned guidance, the *Kolstad* Court then remanded its own matter to the district court so it could determine whether the plaintiff could identify facts sufficient to support an inference that the requisite mental state could be imputed to the employer. *Id.* at 546.

Turning to the instant matter, evidence exists showing that defendants had anti-discrimination policies in place in the workplace. There is also evidence illustrative of defendants' anti-discrimination training that all managerial employees may have received. Thus, there is evidence that weighs in favor of finding that defendants made a good-faith effort to comply with Title VII.

In contrast to this evidence, the record provides evidence indicating that Michelle Stahl, Senior Divisional Human Resources Director, and Matthew Miles, a Divisional Vice President, made the decision to terminate plaintiff based on an unwritten policy concerning utilizing non-employees as "volunteers" to assist in a Rite Aid Store. These two managerial employees directed Mr. Suriano, plaintiff's immediate supervisor, who purportedly made age-based comments to plaintiff, to terminate plaintiff. Finally, there is evidence that after plaintiff filed her EEOC charge against defendants, defendants terminated four other employees for violating the same unwritten policy concerning non-employee volunteers. Each of the four employees was above the age 40 and all but one was replaced by person under the age of 40. Plaintiff herself was replaced by a 25-year old.

A jury must first determine whether the actions of the defendants' employees were made with "malice" or "reckless indifference" to plaintiff's Title VII rights. Only then can this Court determine as a matter of law whether their actions should not be imputed to defendants.

15

Determining an employer's intent or motive for its employment actions is a task best relegated to the fact-finder. *See e.g.*, *Zurik v. Woodruff Family Services*, 2009 WL 4348826, *3 (W.D. Pa. 2009); *Dohner v. Clearfield County, Pa.,* Slip Copy, 2009 WL 2762548 (W.D.Pa. 2009); *Dowling v. Home Depot,* 2003 WL 40741, *5 (E.D.Pa. 2003).

Because the resolution of the factual disputes discussed above will turn largely on the credibility of witnesses at trial, at this stage of the proceedings this Court cannot properly conclude that defendants did not act with "malice" or "reckless indifference." Therefore, defendants' motion for summary judgment with respect to plaintiff's claim for punitive damages under Title VII is denied without prejudice to re-raise the matter in a Rule 50 Motion.

### C. Identity of Plaintiff's Employer

Finally, defendant argues that summary judgment should be entered in favor of Rite Aid Corporation and Rite Aid of PA, Inc., claiming that "there are no issues of material fact to support [plaintiff's] claim that they are [her] employer." (Doc. No. 31 at p.14). Defendant relies on *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72 (3d Cir. 2003), for the proposition that neither entity can be liable under the facts set forth here.

In *Nesbit*, the Court of Appeals for the Third Circuit held that a company and its affiliates will constitute a single employer for purposes of the fifteen-employee threshold of Title VII when: 1) the company has split itself into entities of less than fifteen employees to evade the statute's reach; 2) the parent directs the subsidiary's discriminatory act; or 3) the test for substantive consolidation is met. (*Id*. at 85-6). The Court of Appeals then provided further detail to explain each test. (*Id.* at 86-7). Because this Court finds that there is no evidence that either Rite Aid Corporation or Rite Aid of PA, Inc. split itself into entities of less than fifteen employees, only the second and third tests will be discussed.

16

Beginning with the second test where the parent directs the subsidiary's act, the Court of Appeals held:

> When the companies sought to be aggregated for Title VII purposes are in a parent-subsidiary relationship, we shall deem a parent and subsidiary a single employer when the parent has directed the subsidiary to perform the allegedly discriminatory act in question. By directing such an act, the parent disregards the separate corporate existence of the subsidiary and thus forfeits the right to be treated as a separate entity for Title VII purposes. Moreover, in such a situation the parent itself has committed the act in question and thus should share responsibility with the subsidiary.

*Id*. at 86.

With respect to the third test, concerning substantive consolidation, the Court of Appeals stated:

> We adopt an intentionally open-ended, equitable inquiry - which we consider one of federal common law - to determine when substantively to consolidate two entities. While in the bankruptcy context the inquiry focuses primarily on financial entanglement, for Title VII the focus more often rests on the degree of operational entanglement – whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include: (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. That is not to say that the considerations showing financial entanglement are not relevant in Title VII cases; they assuredly are. Indeed, the line between operational and financial may be blurred (e.g., when the third parties dealing with entities as one unit are creditors). However, we assume that financial entanglement will be present less frequently in Title VII cases than in bankruptcy cases and will be harder for a Title VII plaintiff to prove, given that a typical Title VII plaintiff has more limited resources and an attorney who does not specialize in financial transactions. Proving extensive financial entanglement will, however, bolster a Title VII plaintiff's case.

*Id*. at 87-88 (all footnotes omitted).

In this case, defendant argues that neither of the latter two tests apply because: (1) plaintiff was employed by Thrift Drug, Inc., not Rite Aid of PA, Inc. nor Rite Aid Corporation; (2) the ultimate decision to terminate plaintiff's employment rested with an employee (Michelle Stahl)

17

who was employed by "Rite Aid HDQTRS. Corp."; (3) Rite Aid of PA, Inc. is not a legal entity; and (4) plaintiff adduced no evidence tending to show that Rite Aid Corporation, Rite Aid of PA, Inc., and/or Thrift Drug, Inc. should be substantively consolidated under *Nesbit*. See Doc. No. 31 at p. 15; see also Doc. No. 37, ¶ 69. This Court disagrees.

First, the parties agree that defendant, Rite Aid Corporation, is the "parent company" of defendant, Thrift Drug, Inc. (Doc. No. 37 at ¶ 1). In addition, defendant admitted that "Rite Aid acquired [Thrift Drug] in the summer of 2007" and that plaintiff worked for "Thrift Drug and its successors including Rite Aid, continuously from June 20, 1972 until she was suspended on May 30, 2008 and then terminated." (*Id*. at ¶ 160; see also, *id*. at ¶11.) The parties also agree that plaintiff's employment was terminated on June 3, 2008. (*Id*. at ¶72.) Thus, the second test concerning parent-subsidiary would clearly apply here as to Rite Aid Corporation.

Based upon the admissions of defendant noted above, as well as the Court of Appeals' test set forth in *Nesbit*, this Court finds enough evidence of record to deem Rite Aid Corporation, the parent company, and Thrift Drug, the subsidiary company, to be a single employer. However, evidence exists indicating that Ms. Stahl, an employee of Rite Aid HDQTRS. Corp., not Rite Aid Corporation, directed that plaintiff be fired. Using this evidence, defendant implies either that "Rite Aid HDQTRS. Corporation" is the parent company of Thrift Drug, not Rite Aid Corporation, or that a totally separate company (Rite Aid HDQTRS. Corp.) had the authority to direct the termination of a Thrift Drug, Inc. employee. Based upon defendant's admissions which run contrary to either of these implications, there is, at a minimum, an issue of fact for a jury to consider.[4]

---

[4] In addition, the Court notes that evidence has been adduced showing that Ms. Stahl at least "consulted" or sought the approval of Matthew Miles, a Divisional Vice President, before giving the order to terminate plaintiff. Doc. No. 37, ¶ 71. There is no indication what corporate entity employed Mr. Miles. Furthermore, Ms. Stahl (with the support of

Next, under the substantive consolidation test announced in *Nesbit,* the "[r]elevant operational factors include: (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other." In addition the Court of Appeals in *Nesbit* noted that while the considerations showing financial entanglement are relevant in Title VII cases and will bolster a plaintiff's Title VII claim, financial entanglement will be present less frequently in Title VII cases and will be harder for a Title VII plaintiff to prove, given that a typical Title VII plaintiff has more limited resources and an attorney who does not specialize in financial transactions.

Given the limited evidence presented, including the admissions made by defendant, "Rite Aid" has presented itself as a single company and the business functions – especially the personnel matters relevant to this case over which Ms. Stahl presided – appear to exemplify "unity among the entities, e.g. Rite Aid Corporation, Rite Aid HDQTRS. Corporation, and Rite Aid of PA, Inc.[5]

Based on the foregoing reasons, this Court will deny defendant's motion for summary judgment with respect to Rite Aid Corporation and Rite Aid of PA, Inc.

---

Mr. Miles) directed Lynne Shawley, who in turn directed Jeff Suriano to terminate plaintiff. See Doc. No. 37, ¶¶ 72. Again, there is no indication which corporate entity employed Ms. Shawley or Mr. Suriano.

[5] This Court acknowledges that defendant has claimed that "Rite Aid of PA, Inc." is not a legal corporation. However, this Court takes judicial notice of the fact that "Rite Aid of Pennsylvania, Inc." is a legal corporation organized under the laws of the Commonwealth of Pennsylvania. The United States Supreme Court recently revisited the concept of corporate identification of defendants in *Krupski v. Costa Crociere S. p. A.*, __U.S. __, 130 S.Ct. 2485 (2010), albeit in the context of the "relation back" concept when amending a Complaint. Although it is dicta, the *Krupski* Court, noted "the measure is not whether a plaintiff knew or should have known the precise corporate identity of the proper defendant, but whether the correct defendant knew or should have known that it would have been named as a defendant but for an error." *Id*. at 2493. Based in part on the *Krupski* case and in part on the evidence which exists indicating that all of the Rite Aid entities could be substantively consolidated under *Nesbit*, this Court is not inclined to dismiss this lawsuit against "Rite Aid of PA, Inc." at this juncture. Instead, the Court would entertain a motion to amend the Amended Complaint to accurately reflect the precise corporate identity.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment shall be denied. An appropriate Order follows.